UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

HANOVER INSURANCE COMPANY

     Plaintiff

          -vs-

Index No.: 13-CV-860 (TJM)

VERMONT MUTUAL INSURANCE GROUP

     Defendant
_____

**MEMORANDUM OF LAW
IN REPLY TO
DEFENDANT'S MOTION
FOR SUMMARY
JUDGMENT**

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted on behalf of HANOVER INSURANCE COMPANY ("HANOVER") in opposition to VERMONT MUTUAL INSURANCE GROUP's ("VERMONT MUTUAL") motion for summary judgment pursuant to Rule 56.

As noted in VERMONT MUTUAL's Memorandum of Law (Doc. #31-1, pg. 5), this dispute arises between VERMONT MUTUAL and HANOVER over contribution to a settlement of a lead paint claim. In the underlying personal injury action, even though VERMONT MUTUAL had the opportunity to settle with the underlying plaintiff within its single policy limit of $300,000.00, it refused to do so and a verdict for $770,000.00 resulted leading to a settlement for $809,187.81. In order to protect the interest of the underlying defendants, policy holders with both VERMONT MUTUAL and HANOVER, an agreement between the insurers was reached to indemnify the underlying defendants and then litigate the respective insurers' indemnity obligations. An agreement to that effect was reached between both insurers. (See **Exhibit O** to defendant's Memorandum of Law.) Although VERMONT MUTUAL notes in its

Memorandum of Law that "HANOVER now seeks to disturb the status quo of the 2012 settlement in which both insurers contributed" (Doc. #31-1, pg. 5) the dispute between VERMONT MUTUAL and HANOVER existed during the pendency of the underlying action. As noted in the agreement between VERMONT MUTUAL and HANOVER, it was the expectation of both insurers to litigate their respective indemnity obligations.

Although VERMONT MUTUAL clearly prefers the status quo to exist, it is respectfully submitted that VERMONT MUTUAL's three general liability insurance policies stack, thereby warranting the declaration that VERMONT MUTUAL is responsible for the entirety of the underlying settlement sum of $809,187.81. As the Court can appreciate, the ultimate resolution of this declaratory judgment action will have no effect upon the plaintiffs or defendants in the underlying action and, from that perspective, it will not disturb the "status quo" of the underlying settlement.

VERMONT MUTUAL claims that its policies do not stack since policy coverage is only triggered when an actual injury occurs. Even if the Court accepts this as fact, VERMONT MUTUAL offers no evidence that the infant's injury did not occur in all three policy periods. In fact, VERMONT MUTUAL offers no expert proof to support its conclusory assertion that no injury occurred in the first policy period.

In contrast, HANOVER supported its stance that an injury occurred in all three policy periods through an affidavit of Dr. Joel Redfield, who concluded that an injury in this case occurred upon exposure to the lead hazard, which occurred in the first policy period. As such, the fact that the exposure occurred during all three policy periods, including the first policy period, is uncontroverted.

Without requisite expert opinion, VERMONT MUTUAL cannot take the stance that the underlying infant plaintiff suffered only one injury and that that injury occurred in the second policy period. The only expert proof in regards to this issue has been submitted by HANOVER and it stands in contrast to VERMONT MUTUAL's mere conclusory statement to the contrary.

VERMONT MUTUAL has taken the stance that its "non-cumulation" clause precludes the stacking of all three policies even though an injury has occurred in each of the policy periods. However, VERMONT MUTUAL relies on case law that interprets substantially more robust "non-cumulation" clauses than the clause found in VERMONT MUTUAL's liability policy issued to the underlying defendants. As such, VERMONT MUTUAL's "non-cumulation" clause does not preclude the stacking of its policies considering the fact that it is uncontroverted that an injury occurred in each of the policy periods.

Neither the "unfortunate event" nor the "fortuity doctrine" operates to bar the stacking of policies in this matter. Both of these doctrines require the insured to have knowledge of a loss under the policy at the time the insureds procure coverage. Evidence in the record establishes the Palens did not know of a loss under the policy during any of the three applicable policy periods, and defendant cannot meet its burden of showing the Palens had the requisite knowledge to bar coverage under these doctrines.

Lastly, providing that VERMONT MUTUAL's policies stack, the combined limits of the policies is $900,000.00, which is sufficient for VERMONT MUTUAL to pay for the entire settlement amount including pre-judgment interest.

Accordingly, VERMONT MUTUAL's motion should be denied in its entirety.

**POINT I**

**VERMONT MUTUAL'S NON-CUMULATION CLAUSE DISTINGUISHES THIS MATTER FROM PRIOR CASE LAW INTERPRETING THE NON-CUMULATION CLAUSE FOUND IN POLICIES ISSUED BY ALLSTATE INSURANCE COMPANY.**

**A. THE DEFINITION OF "OCCURRENCE" DOES NOT PREVENT STACKING OF VERMONT MUTUAL's THREE POLICIES AT ISSUE.**

As noted in VERMONT MUTUAL's Memorandum of Law, each of its policies at issue contain the following definition of "occurrence":

> "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in: a. "bodily injury".
> See Doc. #31-1, page 8.

As this Court noted in <u>Endicott Johnson Corp. v. Liberty Mut. Ins. Co.</u>, 928 F. Supp. 176, 181 (N.D.N.Y. 1996), ambiguous policy provisions must be construed against the insurer. However, a careful reading of the definition of "occurrence" clearly leads to a conclusion that an "occurrence" takes place as a result of an accident that may include continuous or repeated exposure to substantially the same general harmful conditions "during the policy period".

There is nothing about the definition of occurrence that would limit VERMONT MUTUAL's exposure to one policy period. VERMONT MUTUAL chose to define "occurrence" as an accident including continuous or repeated exposure to substantially the same general conditions during **"the"** policy period. As such, a

reasonable reading of the definition of occurrence when the facts of this case are applied leads to a simple conclusion that an occurrence can take place during each policy period.

VERMONT MUTUAL certainly could have defined occurrence and limited its exposure by utilizing the term "during a policy period" or "during any policy period". Instead, it had chosen to utilize the phrase "during the policy period". This simply means that when an individual, such as the infant plaintiff in the underlying case, is exposed to continuous or repeated general harmful conditions during each policy period, an occurrence takes place in each of the three policy periods.

As such, carriers rely on "non-cumulation" clauses to limit exposure in instances such as the case at hand where an occurrence took place in each of multiple policy periods. As will be discussed below, VERMONT MUTUAL's "non-cumulation" clause fails to provide such protection to VERMONT MUTUAL.

In sum, VERMONT MUTUAL's definition of "occurrence" is simply supportive of the fact that an occurrence took place in each of the three policy periods implicated in this case. There is nothing about the definition of "occurrence" that would limit VERMONT MUTUAL's exposure to merely one policy period. To construe its provision in favor of VERMONT MUTUAL would force an interpretation of the provision in a manner contrary to its clear language.

**B. VERMONT MUTUAL's "NON-CUMULATION" CLAUSE IS INEFFECTIVE IN LIMITING ITS EXPOSURE TO A SINGLE POLICY LIMIT OF $300,000.00.**

HANOVER agrees that properly worded "non-cumulation" clauses will prevent "stacking" of the policies. However, the "non-cumulation" clause utilized by VERMONT MUTUAL is not nearly as robust as the clauses interpreted in various cases cited by VERMONT MUTUAL for the proposition that its "non-cumulation" clause prevents stacking of its policies.

**i. The Court of Appeals Decision in <u>Hiraldo</u>, infra, and Case Law Interpreting the Non-Cumulation Clauses Utilized by Allstate Insurance Company are Distinguishable from VERMONT MUTUAL's Non-Cumulation Clause and are Inapplicable to the Case at Hand.**

As discussed in HANOVER's Memorandum of Law in support of its motion for summary judgment pursuant to Rule 56, the non-cumulation clause utilized by Allstate as interpreted in <u>Hiraldo</u>, includes robust language eliminating the stacking of its policies. <u>Hiraldo v. Allstate Ins. Co.</u>, 5 N.Y.3d 508 (2005). The essential difference between the non-cumulation clause in the Allstate policy and the VERMONT MUTUAL policy is that Allstate in its non-cumulation clause prevents stacking "regardless of the number of...policies involved". Read differently, the Allstate policy makes it clear that its exposure is limited to the limit of one single policy even when an "occurrence" takes place during multiple policy periods.

As noted in HANOVER's Memorandum of Law, VERMONT MUTUAL's non-cumulation clause fails to include a reference to the "number of policies involved" in contrast to Allstate's non-cumulation clause. The failure to include that particular

phrase is fatal to VERMONT MUTUAL's attempt to limit its exposure to one single policy limit of $300,000.00.

The Court of Appeals in <u>Hiraldo</u> is clear that Allstate prevailed due to the language of its non-cumulation clause. More specifically, the Court emphasized that it relied on the precise phrase "regardless of the number of...policies involved" to limit Allstate's exposure to one policy limit." <u>Hiraldo</u>, supra, at 513.

Considering that that specific phrase is conspicuously absent from VERMONT MUTUAL's non-cumulation clause, it is respectfully submitted that VERMONT MUTUAL's non-cumulation clause is ineffective to limit its exposure to the liability limit of one policy.

### ii. Case Law Interpreting Allstate's Non-Cumulation Clause is Distinguishable Based on Allstate's Robust Non-Cumulation Clause.

Vermont Mutual argues that various Federal Courts interpreted non-cumulation clauses to limit the insurer's exposure over the course of multiple policy periods to the liability limit of one policy. See Doc. # 31-1, pgs. 9-10. See also <u>Greenidge v. Allstate Ins. Co.</u>, 312 F. Supp 2d 430 (S.D.N.Y. 2004), *Aff'd*, 446 F.3d 356 (2d Cir. 2006); <u>Bahar v. Allstate Ins. Co.</u>, 2004 W.L. 1782552 (S.D.N.Y. 2004), Aff'd, Sub Nom., <u>Bahar v. Allstaet Ins. Co.</u>, 159 F. App'x 311 (2d Cir. 2005); <u>Greene v. Allstate Ins. Co.</u>, 2004 W.L. 1335927 (S.D.N.Y. 2004); <u>Nesmith v. Allstate Ins. Co.</u>, 103 A.D.3d 190 (4th Dept. 2013).

At the outset, it is important to note that the Court of Appeals in <u>Hiraldo</u> agreed with "[t]he recent decisions of three Federal District Judges, applying New York

law and interpreting identical policy language" in <u>Bahar</u>, <u>Greene</u>, and <u>Greenidge</u>. However, the Court of Appeals noted its agreement with the three Federal District Judges interpretation of "Allstate's non-cumulation clause." <u>Hiraldo</u>, supra, at 513.

As Allstate's non-cumulation clause expressly forbids the stacking of policies irrespective of "the number of policies" triggered during continuous exposure to lead, these decisions are not applicable to this case as VERMONT MUTUAL's non-cumulation clause is not nearly as comprehensive as the one utilized by Allstate. Without VERMONT MUTUAL's non-cumulation clause expressly referencing "the number of policies involved", the cases of <u>Bahar</u>, <u>Greene</u>, and <u>Greenidge</u> are distinguished from this case.

In <u>Greene</u>, the Court noted that it interpreted Allstate's non-cumulation clause which included the phrase referencing the number of policies that is absent from VERMONT MUTUAL's non-cumulation clause. In fact, the Court stated that it interpreted an Allstate policy with virtually identical policy language as interpreted by the Appellate Division in <u>Hiraldo</u>, which ultimately was discussed by the Court of Appeals. <u>Greene</u>, supra, at 2.

In <u>Bahar</u>, the Allstate "anti-stacking" provision is identical to that interpreted in <u>Hiraldo</u>. In contrast to VERMONT MUTUAL's non-cumulation clause, Allstate's provision interpreted in <u>Bahar</u> includes a reference to the "number of policies involved", <u>Bahar</u>, supra, at 2. The Court in <u>Bahar</u> relied on the treatment of Allstate's "anti-stacking" language in <u>Greene</u>, <u>Greenidge</u> and the Appellate Division's opinion in <u>Hiraldo</u> in holding that Allstate's non-cumulation clause sufficiently limited its exposure to the liability limits of one policy period.

Again, the rationale utilized by the Court in <u>Bahar</u>, although applicable in regards to Allstate's non-cumulation clause, cannot be used as precedent in interpreting VERMONT MUTUAL's significantly less robust non-cumulation clause.

Similarly, the Appellate Division's holding in <u>Nesmith v. Allstate Ins. Co.</u>, supra, lends no further support to VERMONT MUTUAL's position. The policy discussed in <u>Nesmith</u> was issued by Allstate Insurance Company with the same comprehensive non-cumulation clause as discussed in the aforementioned case law. See <u>Nesmith</u>, supra, at 192. In fact, the Court in <u>Nesmith</u> notes that the "Court of Appeals interpreted this insurer's nearly identical policy provision in <u>Hiraldo</u>". <u>Id</u>. at 192. Citing to the opinions in <u>Bahar</u>, <u>Greene</u>, and <u>Greenidge</u>, the Court noted that "The non-cumulation clause was fatal to the plaintiff's claim that the insurer should pay its full policy limits on all three policies". <u>Id</u>. at 192-193.

Again, the decision in <u>Nesmith</u> interpreted a significantly different non-cumulation clause than one utilized by VERMONT MUTUAL. Since VERMONT MUTUAL's non-cumulation clause fails to utilize Allstate's non-cumulation clause, it cannot be afforded similar protection that Allstate was afforded in the aforementioned case law.

As such, it is respectfully submitted that all of the case law relied upon by VERMONT MUTUAL that interpreted Allstate's non-cumulation clause is not applicable to this case.

Considering that the definition of "occurrence" does not protect VERMONT MUTUAL from exposure under each policy period, similarly its deficient non-cumulation

clause does not limit or prevent the stacking of each of its three policies in the case at hand.

As such, VERMONT MUTUAL's motion for summary judgment should be denied.

### iii. This Court's Decision in <u>Endicott Johnson Corporation</u> is Distinguishable from the Facts of this Case.

VERMONT MUTUAL has taken the position that this Court has previously held that "non-cumulation clauses such as [VERMONT MUTUAL's] will prevent stacking of the policies" citing to this Court's decision in <u>Endicott Johnson Corp. v. Liberty Mut. Ins. Co.</u>, 928 F. Supp. 176 (N.D.N.Y. 1996). However, other than the fact that the <u>Endicott</u> case was a declaratory judgment action and involved two insurance companies, there are no other similarities. In <u>Endicott</u>, seventeen separate policies issued between 1954 and 1970 were interpreted by this Court. Unlike in this matter, certain of the policies included a "Deemer" clause, "One-Year Reporting" requirement, and a non-cumulation clause that bears no similarity to the non-cumulation clause found in VERMONT MUTUAL's policies at hand. In Endicott, the "non-cumulation" clause stated as follows:

> [i]f the same occurrence gives rise to...property damage that occurs partly before and partly within the policy period, then each occurrence limit and the applicable aggregate limit...of this policy shall be reduced by the amount of each payment made by the company with respect to such occurrence under a previous policy or policies of which this policy is a replacement. See <u>id</u>. at 179-180.

It is clear that the non-cumulation clause in <u>Endicott</u> is completely different from the one utilized by VERMONT MUTUAL in this case. The fact that the Liberty

Mutual's non-cumulation clause provides for a reduction of each occurrence limit by the amount that Liberty Mutual has paid for such occurrence under the previous policy completely distinguishes it from VERMONT MUTUAL's non-cumulation clause. Although nothing prevented VERMONT MUTUAL from utilizing language similar to that used by Liberty Mutual in the <u>Endicott</u> case, VERMONT MUTUAL chose to forego such protections by wording its non-cumulation clause in a completely different fashion.

Additionally, VERMONT MUTUAL also did not utilize a "Deemer" clause as used by Liberty Mutual in <u>Endicott</u>. A "Deemer" clause would also potentially have reduced VERMONT MUTUAL's exposure in this case, but it had failed to include such a clause in the policies at issue.

As such, contrary to VERMONT MUTUAL's argument that <u>Endicott</u> contained "similar non-cumulation language" as contained in VERMONT MUTUAL's policies, even a cursory reading of Liberty Mutual's non-cumulation clause leads to a conclusion that its non-cumulation clause is significantly more robust than the clause utilized by VERMONT MUTUAL. As such, this Court's decision in <u>Endicott</u> provides little in terms of guidance to this case other than it is yet another example that a properly worded and sufficiently robust non-cumulation clause can prevent stacking of multiple policies.

As noted in HANOVER's initial moving papers, VERMONT MUTUAL's non-cumulation clause does not sufficiently prevent stacking of VERMONT MUTUAL's policies. It is submitted that, therefore, VERMONT MUTUAL's motion for summary judgment should be denied.

**iv. Considering the Facts of this Case and the Definition of "Occurrence" in VERMONT MUTUAL's Policy, the "Unfortunate Event" Test is Inapplicable in this Case.**

The plaintiff argues that this Court apply the "unfortunate event" test if "the Court does not apply the non-cumulation clause". (Doc. #31-1, pg. 12). VERMONT MUTUAL cites to Bausch & Lomb, Inc. v. Lexington Ins. Co., 414 F. App'x 366 (2d Cir. 2011). However, as noted in Bausch & Lomb, under New York law, contracting parties may define "occurrence" in a manner that groups "certain types of similar claims". Id. at 368. Only if the "specific aggregation–of–claims provision" does not "precisely identify the operative incident or occasion giving rise to liability", New York Courts apply the "unfortunate events test". Id. at 368, *citing* Exxon Mobil Corp. v. Certain Underwriters at Lloyd's London, 50 A.D.3d 434, 435 (1st Dept. 2008).

In this case, the grouping provision does apply for each of the three policy periods. As the Court in Bausch & Lomb explained, "New York courts appear to interpret such a grouping provision as at most combining exposures emanating from the same location at a substantially similar time". Id. at 368 citing to Ramirez v. Allstate Ins. Co., 26 A.D.3d 266 (1st Dept. 2006).

As such, considering the facts of this case, HANOVER submits that the definition of occurrence clearly leads to a conclusion that an "occurrence" took place under each of the three policy periods. As such, there is no need to rely upon the "unfortunate event" test and, instead, one then must review the "non-cumulation" clause to determine whether each of the policies that were triggered can be stacked or if the non-cumulation clause precludes stacking of the three policies.

As previously noted in this Memorandum of Law and HANOVER's original moving papers, VERMONT MUTUAL's non-cumulation clause does not effectively preclude the stacking of the three policies. As such, VERMONT MUTUAL's motion for summary judgment should be denied.

## POINT II

**VERMONT MUTUAL'S ARGUMENT THAT THE INFANT WAS ONLY INJURED DURING THE SECOND POLICY PERIOD AND THAT THEREFORE THE ONLY COVERAGE TRIGGERED WAS THAT FOR THE SECOND POLICY PERIOD IS CONTRARY TO THE LANGUAGE OF THE POLICY AND THE EXPERT OPINION OF JOEL REDFIELD.**

VERMONT MUTUAL argues that the Infant plaintiff was only injured during the second policy period because he was not tested for elevated lead levels until the second policy period and because the levels appeared to taper in the third period after peaking during the second period. VERMONT MUTUAL bases its argument, in large part, on analysis of when lead exposure leads to lead injury and what the thresholds are for blood lead levels before injury occurs.

However, VERMONT MUTUAL offers no expert opinion relating to these medically-based contentions, and defendant's counsel is not qualified to opine on such issues. As such, the Court should not consider VERMONT MUTUAL's bare assertions unsupported by an expert opinion. In addition, plaintiff has provided the Expert Affidavit of Dr. Joel Redfield, who addresses the Infant's blood lead levels and threshold for

injury upon exposure and comes to the opposite conclusion of defendant's attorney. For these and the foregoing reasons, VERMONT MUTUAL's argument must fail.

VERMONT MUTUAL argues that in New York, injury is not controlled by the "exposure theory", which dictates that an injury occurs on exposure to a toxin. However, the VERMONT MUTUAL policy reads contrary to the case law cited by VERMONT MUTUAL.  Under the language of the VERMONT MUTUAL policy issued to the Palens, the definition of an occurrence is "an accident, including continuous or repeated **exposure** to substantially the same general harmful conditions, which results, during the policy limit, in: a. bodily injury…".  See **Exhibit C** to defendant's Memorandum of Law, page 17, paragraph 5.  The defendant drafted the language applicable to the definition of injury under its policy.  The defendant chose the word "exposure" to harmful conditions.  The defendant cannot now cite case law analyzing insurance policies where such language was absent to support its position that injury does not occur upon exposure.

Continental Cas. Co. v. Rapid-American Corp., 80 N.Y.2d 640 (1993), cited by defendant in support of its argument, analyzes the trigger for asbestos-related coverage.  After applying the injury-in-fact test, which defendant argues is the controlling law in New York, the Court must determine when the injury, sickness, disease or disability actually began.  See id.

In this case, Dr. Joel Redfield has offered his expert opinion that injury due to lead paint begins upon exposure to the lead paint hazard.  Defendant has offered no evidence in admissible form to dispute Dr. Redfield's conclusions which are based upon

data from plaintiff's medical records, specifically, blood lead levels measurements taken at various points throughout the Infant, G.C.'s, tenancy at the 26 West Chester apartment.

Defendant cannot meet its burden on its summary judgment motion of showing that the Infant plaintiff's injury did not occur upon exposure. Plaintiff has offered expert testimony that the Infant in the underlying action was exposed to the trigger (lead paint) and sustained immediate injury during the first policy period and all subsequent policy periods during which he lived in the 26 West Chester Street residence, on the basis that injury due to lead poisoning occurs immediately upon exposure. Not only has defendant failed to meet its burden, but plaintiff has met the test defendant asserts is the controlling law of New York. See American Home Products Corp. v. Liberty Mut. Ins. Co., 565 F.Supp 1485 (S.D.N.Y. 1983), *Aff'd as modified*, 748 F.2d 760 (2d Cir. 1984).

In addition, defendant, contrary to its preceding argument, admits that "in terms of lead poisoning, a party need not show symptoms during the policy period but must establish an exposure to a lead hazard during the policy period and a resulting sickness or impairment." See Doc. #31-1, page 14, Point II, paragraph 3, citing Campbell ex rel Campbell v. Metro. Prop. & Cas. Ins. Co., 239 S.3d 179, 182 (2d Cir. 2001); American Home Products, supra.

In Campbell, a declaratory judgment action was brought against the liability insurer on behalf of children who suffered lead poisoning as a result of exposure to lead-based paint in the insured's apartment building. See id. The Second Circuit held

that the expert testimony offered, which stated that onset of injury occurred shortly after the children moved into the apartment, was admissible and that it was not necessary for the injured plaintiffs to establish permanent injury or to provide evidence of the magnitude of the injury sustained during the first policy period to recover under the first policy. See id. at 180-181.

As did the defendant in this case, defense counsel in Campbell argued that there was no injury during the first policy period because the plaintiff's could not show that the children sustained an injury during that period, even though the plaintiff's were exposed to lead paint during that period. On behalf of the plaintiff in Campbell, Dr. John F. Rosen testified that it would have been impossible for the children in the apartment to have escaped ingesting at least small particles of lead. See id. at 182.

Notably, Dr. Rosen testified on behalf of the Infant, G.C., in the underlying matter, giving an almost identical opinion. This is the same opinion that Dr. Redfield has provided in his expert affidavit accompanying plaintiff's motion for summary judgment.

Defendant has not offered any expert opinion to the contrary, making it impossible for VERMONT MUTUAL to meet its burden on summary judgment. Based on Dr. Rosen's testimony in Campbell, the United States District Court for the Southern District of New York determined that bodily injury had occurred during the first policy period. See id. This decision was upheld by the Court of Appeals for the Second Circuit.

Downey v. 10 Realty Co., Inc., 2009 WL 2844437 (2009) is cited by defendant in support of its argument that bodily injury did not occur in the first policy period. However, in Downey, the plaintiff did not argue that injury occurs upon exposure. Therefore, the Court was not asked to consider that issue, nor did it comment on same. The only relevant principle to take from Downey is that the injury-in-fact test is applicable in New York, as enunciated in American Home Products, supra.

In American Home Products, Liberty Mutual Insurance Corporation issued a commercial general liability policy to plaintiff American Home Products, a diversified company manufacturing drugs, foods and household products.  The policy provided coverage for "occurrences" which resulted in "personal injury, sickness or disease including death…sustained by any person". The VERMONT MUTUAL policy provides coverage for "occurrences" which result in "bodily Injury" defined as "bodily harm, sickness or disease, including required care, loss of services and death that results." See **Exhibit C** to defendant's Memorandum of Law, page 17, paragraphs 1 and 5.  The United States District Court for the Southern District of New York determined that an "occurrence" under the policy should be read to mean "any point in time at which a finder of fact determines that the effects of exposure to a drug actually resulted in a diagnosable and compensable injury."  The Court further found that "*an injury may occur in this sense upon exposure*, at some point in time after exposure but before manifestation of the injury, and at manifestation." See id. at 1488-1489 (emphasis added).  The Court rejected Liberty Mutual's argument that the trigger of insurance coverage *must* be the manifestation of an injury.

American Home Products is cited by defendant VERMONT MUTUAL to be the standard in New York. See Doc. #31-1, page 14, Point II, paragraphs 2-3. Ironically, American Home Products supports plaintiff HANOVER's position that the Infant, G.C., suffered an actual injury during his entire tenancy at the 26 West Chester Street address, which encompasses all three policy periods at issue in this case. Furthermore, HANOVER met the standard set out in American Home Products.

Additionally, the Court found that a real but undiscovered injury, proved in retrospect to have existed at the relevant time, would establish coverage, irrespective of the time the injury became manifest. The Court followed by stating "so long as the insured is held liable for an identifiable and compensable injury, sickness, or disease that is shown to have existed during coverage, that liability will be insured against whether or not the injury coincides with exposure or manifestation." See id. at 1498.

The case law cited by VERMONT MUTUAL in its motion for summary judgment actually supports HANOVER's position that the policy is triggered upon exposure and injury. It is clear that the injury does not have to manifest itself during a particular policy period to trigger the coverage under that policy period. In fact, a doctor's expert affidavit that such injury existed during the policy period does trigger the policy at issue, even if the injury was not overtly apparent during that policy period.

VERMONT MUTUAL's arguments that since the Infant, G.C., was not tested during the first policy period there is no evidence the Infant was injured during the first policy period fail due to the aforementioned case law and the affidavit of Dr. Joel Redfield. VERMONT MUTUAL's counsel erroneously states "it is well settled that mere

exposure to a toxin is insufficient to trigger coverage." Exposure to a toxin will be sufficient to trigger coverage if injury results from that exposure, which it did in this case. See American Home Products, supra. The affidavit of Dr. Joel Redfield and the Infant's medical records, cited to by counsel for defendant VERMONT MUTUAL, indicate that the Infant, G.C., suffered injury from lead poisoning during all three policy periods.

The same logic applies to defendant's argument that the Infant plaintiff was not injured during the third policy period on the grounds that his blood lead test peaked at a level of 23 µg/dL during the second policy period and declined thereon after. Defendant's counsel is not qualified to opine on the level or seriousness of injuries sustained by individuals with lead poisoning. Defendant has not offered any expert opinion to support his own contentions.

Pursuant to Federal Rule of Evidences 701 and 702, "[i]f a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are...not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." See Point-Du-Jour v. Am. Airlines, 2009 WL 3756627 (E.D.N.Y. 2009). Furthermore, "Federal Rule of Civil Procedure 56(e) requires affidavits to be based upon "personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." See id.

In Point-Du-Jour, the plaintiffs submitted affidavits regarding proper operation of aircrafts, proper maintenance on aircrafts, and criticism of how a pilot navigated the airplane on which the plaintiffs allegedly suffered injury due to turbulence. The Court

found these issues required scientific, technical or other specialized knowledge within the scope of Rule 702. The Court held "[b]ecause plaintiffs are not qualified as experts, they may not offer technically and factually unsupported "evidence" in support of their proffered theories of liability." See id.

Mr. Miranda attempts to analyze the level of injury associated with various blood lead levels. (Doc. #31-1, pages 14-16) He also offers opinions as to whether lead exposure causes injury immediately or at a later date. (Doc. #31-1, pages 14-16). Mr. Miranda offers no underlying support for his contentions and provides no expert affidavit to support those contentions. Clearly, analysis of medical conditions, including injury due to lead exposure and analysis of blood lead levels, is not a subject area in which Mr. Miranda has the requisite expertise. Therefore, the assertions by defendant's counsel in his memorandum of law (Doc. #31-1, pages 14-16), should be considered by the Court as inadmissible evidence related to a technical and specialized subject matter in regards to which Mr. Miranda has no requisite expertise.  For this reason alone, defendant has failed to meet its burden on its motion for summary judgment.

Finally, defendant asserts that because no medical treatment for the child was rendered during the policy period years except for the blood tests, plaintiff HANOVER cannot show that the Infant suffered an injury-in-fact during the three policy periods. Defendant cites no case law to support this contention and none exists.

**NEITHER THE "FORTUITY DOCTRINE" NOR THE
"KNOWN LOSS" DOCTRINE BAR COVERAGE FOR THE
INJURY SUSTAINED BY INFANT G.C. DURING THE
THIRD POLICY PERIOD.**

Defendant, VERMONT MUTUAL, argues that the fortuity doctrine, as enunciated

in National Union Fire Ins. Co. v. Stroh Companies Inc., 265 F.3d 97, 107 (2d Cir. 2001)

and the related "known loss" doctrine bar coverage under the third VERMONT MUTUAL

policy.  Defendant alleges that the insureds in the underlying action, Ralph G. Palen and

Nancy J. Palen, were aware of both the lead hazard at the premises and the injury to

*Infant*, G.C., at the time the third policy took effect. However, defendant fails to cite to

any evidence in the record that shows either of the Palens had knowledge of the Infant's

lead *injury* at the time the third policy was renewed. Moreover, such evidence does not

exist, and in fact, Mr. Palen's sworn testimony contradicts defendant's unsupported

contentions that the Palens absolutely knew the Infant, G.C., suffered an injury on their

premises at the time the third policy was renewed.

As will be discussed below, Mr. Palen repeatedly testified that he was unaware of

the dangers of lead paint and certainly did not testify that he was aware that the infant

plaintiff was injured during the second policy period. His Declaration, attached as

**Exhibit B** to Plaintiff's Memorandum of Law in Reply to Defendant's Motion for

Summary Judgment, contains sworn statements detailing his knowledge regarding

injury caused by lead paints, the communication he received from the Ulster County

Health Department, and the communication he received from the

Concepcions.Defendant's arguments based on the "fortuity doctrine" and "known loss"

doctrine require the insured to have actual knowledge that a loss has occurred. The

Palens did not have this knowledge, and defendant's argument fails for this and the foregoing reasons.

**A. THE "KNOWN LOSS" DOCTRINE DOES NOT BAR COVERAGE BECAUSE THE INSUREDS DID NOT KNOW A LOSS WAS SUSTAINED AT THE INCEPTION OF THE THIRD POLICY PERIOD.**

The "known loss" doctrine bars claims where an insured knows of a loss. It does not bar claims from insureds who, at most, could have known of the risk of loss but were not aware of the actual loss. See <u>National Union Fire Ins. Co. v. Xerox Corp.</u>, 6 Misc.3d 763 (Sup.Ct. New York County 2004). It is set out in <u>National Union v. Xerox Corp</u>, that the "known loss" doctrine is not applicable to situations where "an insured merely knows there is a risk of loss, as knowledge of a risk is the very purpose of acquiring insurance." See <u>id</u>. at 779, citing <u>City of Johnstown, New York v. Bankers Standard Ins. Co.</u>, 877 F.2d 1146, 1152 (2d Cir. 1989).

In <u>National Union v. Xerox</u>, the plaintiffs alleged that the losses under the policy represented a loss known to Xerox prior to the commencement of the policy. The Court, however, found that it was "obvious" that the defendants could not have known of the loss itself, only of, at most, the risk. See <u>id</u>. at 779.

In the instant matter, Ralph G. Palen and Nancy J. Palen, are in the same position as the defendants in <u>National Union v Xerox Corp</u>. The loss under the VERMONT MUTUAL policy, the bodily injury sustained by the Infant, G.C., was not a known loss to the Palens at the time they renewed their policy for a third time with

VERMONT MUTUAL. See Declaration of Ralph G. Palen, attached as **Exhibit B** to Plaintiff's Memorandum of Law in Reply to Defendant's Motion for Summary Judgment.

The records relative to the underlying action show that the Ulster County Health Department inspected the premises and conducted lead level tests on multiple surfaces at 26 West Chester Street on October 18, 2004. See **Exhibit Q** to defendant's Memorandum of Law.  The Palen defendants were informed that the Infant had elevated blood levels via two letters dated October 19, 2004. See **Exhibit R** to defendant's Memorandum of Law. The Palens were also notified in these letters that they needed to take immediate remedial action regarding lead paint abatement.  See **Exhibit R** to defendant's Memorandum of Law. While these letters notified the Palens that the Infant, G.C., was exposed to lead and there was a lead hazard present on the premises, these letters did not state that the Infant, G.C., was injured. See **Exhibit R** to defendant's Memorandum of Law.

The defendant cites to no authority which supports its assertion that the Palens were aware *an injury or loss* under the policy had occurred. Rather, defendant simply points to two letters from the Ulster County Health Department stating that "a child residing at your rental property has an elevated blood lead level" and that the apartment was designated as an area of "high risk." See **Exhibit R** to defendant's Memorandum of Law. Nowhere in any documentation in the record do the Palens state they were aware of injury. The fact that the Palens submitted a remediation plan to the Ulster County Health Department on November 13, 2004 does not demonstrate their awareness of injury to the Infant. See **Exhibit S** to defendant's Memorandum of Law. Rather, it shows

compliance with the letter from the Ulster County Health Department directing them to submit such a plan.

Therefore, defendant's conclusion that the insureds were aware that a loss had occurred before the third policy period began is supported by no admissible evidence. The defendant failed to meet its burden on its motion for summary judgment.

Furthermore, defendant's current position, as discussed in the preceding section, is that lead exposure and certain blood lead levels do not result in an injury. Defendant cannot logically assert that position while simultaneously arguing that the Palens, with no known access to the infant plaintiff's medical records that are now possessed by defendant, should have divined that because a child had elevated lead levels, the child therefore suffered an injury as defined under the VERMONT MUTUAL policy. These positions are irreconcilable.

There exists no "known risk" doctrine in New York. See City of Johnstown, supra, at 1152. The Second Circuit has repeatedly held that knowledge of a risk does not make that risk uninsurable. See id. Therefore, counsel for VERMONT MUTUAL is incorrect in stating that the insureds are barred from recovery due to knowledge of a lead *hazard*. See National Union v. Xerox Corp. Knowledge of a risk of loss is not the equivalent of knowledge of the loss itself. See id. at 779. Only knowledge of the loss operates to bar recovery. See id.; City of Johnstown at 1152.

In Union Carbide Corp v. Affiliated FM Ins. Co., 29 Miss.3d 1201(A) (Sup.Ct. New York County 2010), a New York Court analyzed the "known loss doctrine" in the context of an asbestosis claim. In Union Carbide, Affiliated FM Insurance Company

sought to deny coverage to Union under the "fortuitous loss" and "known loss" doctrines, as VERMONT MUTUAL does in this case. See id. The Court found that while Union Carbide may have been aware that its products carried a risk of asbestosis and cancer in users and that Union may have also been aware that users had begun to make claims against the company, it was "perfectly acceptable" for Union to "'replace the uncertainty of its exposure with the precision of insurance premiums and leave it to the insurers' underwriters to determine the appropriate premiums.'" See id. at 1201, citing Stonewall Ins. Co. v. Asbestos Claims MGT. Corp., 73 F.3d 1178, 1215 (2d Cir. 1995).

The Court also referenced City of Johnstown in its holding ("to exclude all losses or damages which might in some way have been expected by the insured, could expand the field of exclusion until virtually no recovery could be had on insurance"). The Union Carbide Court found against Affiliated FM Insurance Co. and decided that the coverage issued by the policy would not be altered by the Court, as the "fortuity doctrine" and "known loss" doctrines were not applicable.

In his sworn testimony at the trial of the underlying action, Ralph G. Palen testified that before the Concepcions moved into 26 West Chester Street, he had never heard about the dangers from lead paint. See **Exhibit A** to plaintiff's Memorandum of Law in Reply to Defendant's Motion for Summary Judgment, page 362. He stated that he had heard lead paint could cause damage but was unaware of the general dangers of lead paint. See **Exhibit A** to plaintiff's Memorandum of Law in Reply to Defendant's Motion for Summary Judgment, page 363. Mr. Palen also testified that he did not know damage could be caused by lead paint ingestion and did not know anything about lead

paint poisoning prior to the commencement of the underlying action. He testified knowing that children can chew on woodwork and that paint could be ingested by children but testified that he had no knowledge regarding the Infant, G.C. and whether he chewed on wood in the Concepcion apartment. See **Exhibit A** to plaintiff's Memorandum of Law in Reply to Defendant's Motion for Summary Judgment, page 371-373.

Mr. Palen testified that it was his understanding from the Ulster County Health Department that any area in the house which has a high reading was not necessarily dangerous but could contain lead paint underneath the surface. See **Exhibit A** to plaintiff's Memorandum of Law in Reply to Defendant's Motion for Summary Judgment, page 381. He testified that he submitted the remediation proposal according to the guidelines by the Ulster County Health Department. See **Exhibit A** to plaintiff's Memorandum of Law in Reply to Defendant's Motion for Summary Judgment, page 381-382. He also testified that he received the letter from the Ulster County Health Department dated October 19, 2004 stating that there was a young child staying at the 26 West Chester Street address who had elevated blood lead levels. See **Exhibit A** to plaintiff's Memorandum of Law in Reply to Defendant's Motion for Summary Judgment , page 378.

In his Declaration, attached as **Exhibit B** to plaintiff's Memorandum of Law in Reply to Defendant's Motion for Summary Judgment, Ralph Palen states he had no knowledge at any point during the Concepcions' tenancy that Infant, G.C., suffered injury as a result of lead paint exposure. See **Exhibit B** to plaintiff's Memorandum of Law in Reply to Defendant's Motion for Summary Judgment.. He states that he was

unaware of the existence of lead paint on the premises until receiving notice from the Ulster County Health Department on October 18, 2004. See **Exhibit B** to plaintiff's Memorandum of Law in Reply to Defendant's Motion for Summary Judgment. He confirms, in accordance with the record before the Court, that the Ulster County Health Department never advised him, either verbally or in writing, that the Infant, G.C., suffered injury from exposure to lead paint at 26 West Chester Street. See **Exhibit B** to plaintiff's Memorandum of Law in Reply to Defendant's Motion for Summary Judgment.

Ralph Palen was unaware that the Infant plaintiff was injured as a result of exposure to lead until the plaintiffs initiated the underlying suit with a filing and service of a summons and complaint. See **Exhibit B** to plaintiff's Memorandum of Law in Reply to Defendant's Motion for Summary Judgment. He was unaware that lead paint was hazardous until notified by the Ulster County Health Department. See **Exhibit B** to plaintiff's Memorandum of Law in Reply to Defendant's Motion for Summary Judgment. Knowing that lead is a hazard does not constitute the requisite knowledge for VERMONT MUTUAL to invoke the "known loss" doctrine nor the "fortuity doctrine." VERMONT MUTUAL has failed to meet its burden on summary judgment of demonstrating by evidence in admissible form that the Palens had *knowledge of a loss* prior to renewing the policy a third time. As such, VERMONT MUTUAL cannot invoke the principals of the either doctrine to prevent HANOVER from enforcing its rights as the excess insurer.

**B. THE "FORTUITY DOCTRINE" DOES NOT BAR COVERAGE BECAUSE THE INSUREDS DID NOT KNOW A LOSS WAS SUSTAINED AT THE INCEPTION OF THE THIRD POLICY PERIOD.**

Defendant VERMONT MUTUAL attempts to argue that the fortuity doctrine bars coverage during the third policy period based on a "likely loss." The United States Court of Appeals, Second Circuit has "expressly rejected the existence of such a "known risk" doctrine under New York law. See <u>National Union v. Stroh</u>, at 108, citing <u>City of Johnstown</u> at 1152-53. The Court clearly determined that the "fortuity doctrine" does not bar coverage for likely losses. See <u>id</u>.

Furthermore, Second Circuit held that New York "does not recognize the 'broader position that a risk, once "known" is uninsurable.'". See <u>City of Johnstown</u> at 1153. In referencing <u>Stonewall</u>, <u>supra</u>, the Second Circuit held that as there was *no loss* at the inception of the policy, and *only* a *known risk* of loss, neither the "known loss" doctrine nor the "fortuity doctrine" barred recovery by the insured. See <u>National Union v. Stroh</u> at 108. Specifically stated, "even if the risk was known, and known to be high, at that time [of the policy's inception] – a question hotly in dispute – the known loss doctrine does not bar coverage." <u>Id</u>.

As the fortuity doctrine bars only actual losses that the policy holder knows of, planned, intended, or was aware would be substantially certain to occur, these doctrines are inapplicable to this case. Ralph Palen testified under oath that he was unaware of the specific dangers that could be caused by lead paint. See **Exhibit A** to plaintiff's Memorandum of Law in Reply to Defendant's Motion for Summary Judgment.. No testimony exists, nor does defendant attempt to point to same, stating that the insureds knew that bodily injury had occurred to the Infant, G.C., as a result of the elevated blood

lead levels they were notified of in October of 2004. Furthermore, the Declaration of Ralph Palen proves that he had no knowledge an injury had occurred until served with a Summons and Complaint in the underlying action. See **Exhibit B** to plaintiff's Memorandum of Law in Reply to Defendant's Motion for Summary Judgment.

Contrary to defendant's assertion, the letters from the Ulster County Health Department did not give notice to the insureds of lead injury, but rather gave notice of the lead hazard present on the premises. See **Exhibit R** to defendant's Memorandum of Law. The plain language of the letters and sworn statements of Ralph Palen in his Declaration demonstrate that the insureds did not have knowledge of a loss. See **Exhibit B** to plaintiff's Memorandum of Law in Reply to Defendant's Motion for Summary Judgment. VERMONT MUTUAL has not met its burden of showing that the Palens knew of a loss under the policy, and, therefore, VERMONT MUTUAL cannot invoke either the "fortuity doctrine" or the "known loss" doctrine.

## POINT IV

### VERMONT MUTUAL IS LIABLE FOR PREJUDGMENT INTEREST ON THE VERDICT IN THE UNDERLYING ACTION IN ACCORDANCE WITH ITS POLICY LANGUAGE.

VERMONT MUTUAL argues that it is not liability for prejudgment interest on the verdict in the underlying action because it has paid out its policy limits for the only policy it considers applicable, the second policy period, which had a limit of $300,000.00.

However, VERMONT MUTUAL has failed to meet its burden on summary judgment proving that only one policy limit applies to the underlying action. As such, according to the case law promulgated by VERMONT MUTUAL and the language of its

policy, VERMONT MUTUAL is liable for up to $900,000.00 in damages, including prejudgment interest, and prejudgment interest does not exceed this amount.

The defendant correctly states that under New York law, an insurance company is not liable for prejudgment interests in excess of the limits of its policy, unless the policy contains a contrary provision. See Ragins v. Hospitals Inc. Co., 22 N.Y.3d 1019 (2013). However, in Ragins, the New York State Court of Appeals held that the primary insurer was not responsible for prejudgment interest because the primary insurer had paid out the applicable policy limits and the excess policy was triggered. See id. The Court analyzed the language of the policy, which was similar to the VERMONT MUTUAL policy. The VERMONT MUTUAL policy states as follows:

> Coverage L-Personal Liability
>
> If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:
>
> 1. Pay up to our limit of liability for the damages for which the "insured" is legally liable. Damages include prejudgment interest awarded against the "insured".
> See **Exhibit C** to defendant's Memorandum of Law, page 18, "COVERAGE L – PERSONAL LIABILITY, paragraph 1.

Each of the three policies at issue contains this language. Therefore, if the policies stack, VERMONT MUTUAL is required to pay prejudgment interest for interest up to the applicable amount of its policies.

Defendant VERMONT MUTUAL argues that since only one policy was triggered, it owes no more than $300,000.00 toward the settlement, including prejudgment

interest. However, as is argued in HANOVER's motion for summary judgment, VERMONT MUTUAL was obligated to indemnify its insureds, Ralph G. Palen and Nancy J. Palen, under all three policies in the underlying action. The policy limit of $300,000 per policy creates $900,000.00 in available coverage from VERMONT MUTUAL to the Palens. The $900,000.00 available is sufficient to cover prejudgment interest. Therefore, in accordance with the language of its policy, defendant is liable to pay up to its limit of $900,000.00 for damages awarded to the plaintiffs in the underlying action, including prejudgment interest awarded against the Palens.

In <u>Ashkenazy v. National Union Fire Ins. Co. of Pittsburgh, PA</u>, 245 A.D.2d 326 (2d Dep't 1997), cited by defendant, (Doc. #31-1, pg. 19, Point IV, paragraph 1) the Court determined that absent a contractual provision stating otherwise, a liability insurance carrier is not liable for prejudgment interest in excess of the limits of the policy. See <u>id</u>. at 327. This case is irrelevant to the instant matter because the prejudgment interest sought by HANOVER falls within the $900,000 of available coverage procured by the Palens in their primary policy with VERMONT MUTUAL.

Likewise, the <u>Matter of Russo v. Kemper Group</u>, 146 A.D.2d 701 (2d Dep't 1989), also cited by defendant VERMONT MUTUAL (Doc. #31-1, pg. 19, Point IV, paragraph 1) is also irrelevant. In <u>Matter of Russo</u>, the Court analyzed the insurance company's obligation to insure the petitioner relative to damages arising from a wrongful death suit. The Appellate Division, Second Department, again held that the insurer was liable up to the limits of the policy for prejudgment interest included as part of the damages.

VERMONT MUTUAL's argument that its policy has no other allowance for the payment of prejudgment interest above the policy limits is moot. The prejudgment interest sought by HANOVER is within the policy limits of the three policies VERMONT MUTUAL afforded to the Palens in the underlying action. Since defendant VERMONT MUTUAL has not exhausted the collective amount of its policies ($900,000.00) VERMONT MUTUAL is liable for the prejudgment interest on the amount awarded against the Palens. Its own policy language makes that proposition clear.

Therefore, providing that the policies may be stacked, VERMONT MUTUAL is absolutely liable for prejudgment interest up to the limits of its policy based on the case law it cited in its own moving papers and the language of its policy. As the Palens renewed their policy twice during the Infant, G.C.'s tenancy, the Palens should have been afforded $900,000.00 in coverage. Therefore, the damages recovered by the Infant plaintiff, including prejudgment interest, do not exceed defendant VERMONT MUTUAL's collective liability limits for which it is legally liable. The plaintiff's summary judgment motion relative to the payment of pre-judgment interest should be denied.

DATED:  Buffalo, New York       Respectfully submitted,
        October 24, 2014

                                        /s/THOMAS P. KAWALEC
                                        Thomas P. Kawalec, Esq.
                                        Chelus, Herdzik, Speyer & Monte, P.C.
                                        Attorneys for Plaintiff
                                          HANOVER INSURANCE COMPANY
                                        Office and Post Office Address
                                        Main Court Building
                                        438 Main Street, Tenth Floor

Buffalo, New York 14202
Telephone:  (716) 852-3600

/s/ KATELYN E. DIEFFENDERFER
Katelyn E. Dieffenderfer, Esq.
Chelus, Herdzik, Speyer & Monte, P.C.
Attorneys for Plaintiff
HANOVER INSURANCE COMPANY
Office and Post Office Address
Main Court Building
438 Main Street, Tenth Floor
Buffalo, New York 14202
Telephone:  (716) 852-3600

TO:
Miranda, Sambursky, Slone, Sklarin & Verveniotis, LLP
Attorneys for Defendant
VERMONT MUTUAL INSURANCE GROUP
Office and Post Office Address
240 Mineola Boulevard
Mineola, New York 11501
Telephone:   (516) 741-7755


KED:cmg
303-12-16-138
Doc #666311.1